THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK HICKETTS, Plaintiff in Error.

*Opinion filed December 23, 1926—Rehearing denied Feb. 3, 1927.*

1. CRIMINAL LAW—*statement made in defendant's presence and not denied is admissible.* An admission is implied from the conduct of one charged with crime who remains silent when a statement, which he hears and understands, is made by another in his presence implicating him, under circumstances which afford him an opportunity to speak in reply and where a person similarly situated would naturally make a reply; and the statement is admissible on the theory that the accused has ratified it by not contradicting it, and it is immaterial that he may have denied his guilt at another time.

2. SAME—*when the jury may be instructed that opprobrious language will not mitigate intentional killing—self-defense.* In a prosecution for murder the jury may be instructed that "no provocation by words, only, however opprobrious, will mitigate an intentional killing so as to reduce the killing to manslaughter," where there is evidence of opprobrious language unaccompanied by threat or act; and such instruction is not improper as ignoring the claim of self-defense where it does not attempt to state all the law of the case, there are other instructions on the law of self-defense, and the court instructs the jury to consider all the instructions as a series.

3. SAME—*one instruction need not state all the law on particular subject.* An instruction should be considered with reference to other instructions and a particular instruction need not contain all the law either of the case or upon a given subject, but it is sufficient if the series of instructions, considered as a whole, fully and fairly announces the law applicable to the theories of the prosecution and of the defense.

4. SAME—*when judgment of conviction will not be reversed on evidence.* The Supreme Court will not reverse a judgment of conviction on the ground that the evidence is insufficient to convict, unless the verdict is palpably contrary to the weight of the evidence or the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of the defendant's guilt.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. MARCUS KAVANAGH, Judge, presiding.

WM. SCOTT STEWART, and CHARLES P. R. MACAULAY, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and ROY D. JOHNSON, (EDWARD E. WILSON, CLARENCE E. NELSON, HENRY E. AYERS, and JOHN HOLMAN, of counsel,) for the People.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Frank Hicketts was indicted in the criminal court of Cook county for the murder of Edward Olson. The jury returned a verdict finding Hicketts guilty and fixing his punishment at fourteen years in the penitentiary. Motions for a new trial and in arrest of judgment were made and overruled, judgment was rendered on the verdict and sentence was imposed. Hicketts prosecutes this writ of error for a review of the record.

On August 8, 1925, Edward Olson and Lula Olson, his wife, resided in an apartment on the second floor of the building known as No. 432 Surf street, on the north side of the city of Chicago. Until a short time prior to that date he had conducted a restaurant at 1523 Wabash avenue, on the south side of the city. Frank Hicketts, plaintiff in error, once had an interest in this business and also for a short period had a restaurant at the adjoining number, 1525 Wabash avenue. He had been a member of the police department of the village of LaGrange, in Cook county, and had been employed in the United States marshal's office in Chicago for about one year. He was twenty-eight years of age and lived at the Bentmere Hotel, about two blocks distant from Olson's apartment. Olson, while on the way home in his automobile on the evening of August 7, 1925, saw Hicketts in front of a certain theater. At Olson's request Hicketts entered the car and was driven to the hotel where he resided. Olson invited Hicketts to

call at the former's apartment in about half an hour. Hicketts responded, and, accompanied by Olson and his wife, left the apartment in Olson's automobile. At Diversey boulevard and Clark street, about three blocks from Olson's home, John Flannery, also known as George Kane and sometimes as Johnson, joined them, and the party proceeded to the home of Olson's sister. They remained at her home about an hour, obtained some wine, returned to Olson's apartment, partook of the wine and then went to a restaurant, where they arrived shortly after 1:30 o'clock in the morning. At this restaurant they ate, drank more of the wine, and Mrs. Olson danced with plaintiff in error. According to her testimony she requested her husband to dance with her but he declined, and when she insisted that he do so he became angry, and she slapped him in the face and he left. Plaintiff in error went outside of the restaurant to find Olson but discovered that he had gone in his automobile. Mrs. Olson shortly afterward telephoned her home, but there was no response. Plaintiff in error paid the bill at the restaurant and with Mrs. Olson and Flannery returned to Olson's apartment, arriving there at about 3:20 o'clock A. M. Shortly after their return Flannery was taken ill, and while attempting to reach the bath-room with the assistance of plaintiff in error, Olson entered and inquired the cause of the excitement. Plaintiff in error informed him that Flannery was ill. Olson's anger was aroused because Flannery had been brought to his home at that hour of the morning without his permission and he peremptorily ordered both men to leave. Mrs. Olson testified that her husband took his revolver from a drawer of the dresser and pointed it at plaintiff in error and Flannery, but that after a struggle she persuaded him to return the revolver to the drawer. Plaintiff in error testified that Olson not only pointed the revolver at Flannery and himself, but that he followed them down-stairs and compelled them to enter his automobile; that he, plaintiff in error,

protested that he lived only two blocks distant and would walk but that Olson ordered him in the car; that Flannery and plaintiff in error occupied the rear seat; that Olson drove west, stating that he was going to take plaintiff in error for a ride; that as the automobile turned north into Pine Grove avenue, the first intersecting street, plaintiff in error opened the door, intending to leave the car, but Olson applied the brakes, stopped the car and told him to get back in the car and remain there; that notwithstanding Olson's demand plaintiff in error stepped on the running-board, seized Olson's wrist and took the revolver from him; that Flannery then grabbed plaintiff in error by the throat and at the same time Olson attempted to reach him, and that as the result he, plaintiff in error, shot both Olson and Flannery.

Mrs. Olson testified that about three minutes after plaintiff in error and Flannery left the apartment she heard three shots in close succession and that after a brief interval two more were fired; that she ran into the street but did not see her husband's automobile although she heard its horn sounding from the west; that she ran in that direction and saw the car in Pine Grove avenue; that her husband lay with his head back on the seat and Flannery was stooping over, sounding the horn; that she shook her husband and inquired of him what had happened, and he replied that he had been shot and asked her to obtain assistance; that she attempted to start the car to remove her husband and Flannery to a hospital, but was unable to do so because her husband's feet were in the way; that she hailed a passing taxicab and informed the driver that two men had been shot and asked him to take them to a hospital; that Flannery, bleeding at the mouth, entered the taxicab, and as the driver started away with him she ran after the cab and jumped on the running-board; that a patrol wagon then appeared and a police officer ordered her into the cab and she was taken, with Flannery, to a hospital

and that later she was conveyed to a police station. Another patrol wagon soon arrived at the scene of the shooting. Olson was pronounced dead by a physician and his body was put in that wagon and removed to a morgue.

About four o'clock A. M. on August 8, 1925, Viola Selinger, who lived at 2919 Pine Grove avenue, heard six shots, followed by low-toned voices, the groans of a man and the sounding of an automobile horn. Looking out of her front window she saw a man in the front seat of an automobile and a woman. She shook his head and then attempted to start the car. She also observed a man dressed in gray, wearing a dark hat, crossing the street from the automobile. Her husband called the police. She saw the woman leave the automobile and call a taxicab. The cab backed up and a man left the rear seat of the automobile and entered the cab. The woman ran to the cab, and at the same time a patrol wagon arrived.

Dr. Lewis K. Eastman, coroner's physician, testified that he made a post-mortem examination of Olson's body and found a puncture wound between the third and fourth ribs on the right side, near the breastbone; that the course of the wound was downward and outward at an angle of about forty-five degrees and made an exit in the back, near the spinal column; that on opening the chest he found the right cavity filled with blood and the vessels and lung tissue injured; that he also found a puncture wound on the right arm, which took a backward course and had its exit near the elbow joint, and that upon opening the arm he discovered a fracture and that the important vessels of the arm had been severed. The gun from which the bullets that caused these wounds were fired, the doctor testified, must have been held at an angle of approximately forty-five degrees and directly in front of the body but at some distance, owing to the absence of powder-marks.

One of the police officers testified that he saw a man dressed in gray walking in great haste near the Bentmere

Hotel. The plaintiff in error checked out of that hotel shortly after the shooting occurred and went to the home of his brother-in-law, on the south side of the city, arriving there about five o'clock A. M. He was much excited and told his brother-in-law that he had taken six shots at some person.

Plaintiff in error made varying statements to the police officers concerning the shooting. He told Capt. John Stege that he returned to his hotel after remaining in Olson's apartment about twenty minutes; that there was no altercation; that he knew nothing of the shooting, and that he left the hotel because he had some difference with a girl who was there. Later he stated that Olson shot Flannery, after which he, plaintiff in error, took the gun from Olson and shot him. Still later, when Capt. John J. Naughton told him that the courses of the bullets in Olson's body and the manner in which Flannery was shot indicated that his story of the shooting could not be true, he admitted that he shot Olson three or four times and Flannery twice. On the day after the shooting Capt. Naughton took plaintiff in error to the hospital where Flannery was confined. Flannery identified plaintiff in error and stated that he was the person who with his gun shot Olson and himself. Plaintiff in error made no reply. After leaving Flannery's room in the hospital plaintiff in error denied that Flannery had said that he, plaintiff in error, used his own gun to do the shooting. Capt. Naughton and plaintiff in error, at the former's request, then returned to Flannery's room, and the captain inquired, "Mr. Flannery, there is some question about whose gun it was that did the shooting." Flannery, pointing at plaintiff in error, answered, "It was his gun." Plaintiff in error, addressing Flannery, then said, "You know that was not my gun," and Flannery replied, "I don't know whether it was your gun or not but you pulled it out of your pocket." There was no answer by plaintiff in error and he left with Capt. Naughton.

Plaintiff in error contends that the statement made by Flannery at the hospital was improperly admitted in evidence. This statement was made in his presence, and although ample opportunity was afforded, yet there was no denial by him that he shot Olson and Flannery. While he disclaimed ownership of the gun he did not deny that he drew it from his pocket or that he did the shooting, as Flannery charged. An innocent person in such a situation naturally would have protested his innocence. By his silence under the circumstances plaintiff in error impliedly admitted the truth of the charge. An admission of guilt may be implied from the conduct of a person charged with crime who remains silent when a statement, which he hears and understands, is made by a third person in his presence implicating him, under circumstances which afford him an opportunity to act and speak in reply and in which a person similarly situated would naturally make a reply. The evidence is admitted not because the statement was made but because the accused person has ratified or adopted it as his own by not contradicting it. (*People* v. *Nitti,* 312 Ill. 73; *People* v. *Cardinelli,* 297 id. 116; *People* v. *Lopez,* 296 id. 438; *People* v. *Seff,* 296 id. 120; *People* v. *Tielke,* 259 id. 88.) It is immaterial that plaintiff in error may have denied the shooting at another time. (*People* v. *Lopez, supra.*) No motion was made to strike out the portion of the testimony which related to the ownership of the gun. There was therefore no error in admitting the statement made by Flannery at the hospital.

The first instruction given at the request of the prosecution reads:

"No provocation by words only, however opprobrious, will mitigate an intentional killing so as to reduce the killing to manslaughter."

Plaintiff in error argues that this instruction is erroneous because it is not applicable to the case and ignores the plea of self-defense, and reliance is placed upon *People* v.

*Duncan,* 315 Ill. 106. In that case there was no opprobrious language apart from acts, the threatening words were accompanied by acts indicating a hostile intent dangerous to the defendant's life, and it was held that the words should not be considered by themselves but in connection with the assailant's acts to which they gave character. Under such a state of facts an instruction limited to the words, alone, is improper. In the instant case there was evidence of opprobrious language unaccompanied by threat or act. The first instruction did not purport to be a statement of the law governing the whole case but was applicable to it and correctly stated the law. (*Jackson* v. *People,* 18 Ill. 269; *Steffy* v. *People,* 130 id. 98; *McCoy* v. *People,* 175 id. 224; 1 McClain on Crim. Law, sec. 338.) Moreover, at the request of plaintiff in error the jury were instructed that in determining whether the killing was in self-defense they should consider the circumstances of the killing and the conduct of the parties at the time; that the character of the decedent and any threats made by him, in so far as shown by the evidence, were matters for their consideration, and that they should give them such weight as they deemed proper in determining whether or not the decedent by his words and acts manifested such an intent as would give the defendant reason to apprehend a danger that would justify the shooting on the ground of self-defense as defined in the instructions. Other instructions concerning the effect of threats made by the decedent as manifesting his intent, as well as instructions upon the law of self-defense, were given and no complaint is made of any of them. The court informed the jury that the instructions should be considered together as one series, and that each instruction should be considered in connection with all others bearing upon the same subject. The first instruction was not misleading and there was no prejudicial error in giving it.

It is further contended by plaintiff in error that the fifth and thirteenth instructions given at the prosecution's re-

quest were erroneous in that they ignored the question of self-defense. Both of these instructions were upon the subject of malice and neither purported to be a direction to the jury upon the law of the whole case. It is not charged that either of these instructions failed to state correctly a pertinent or applicable rule of law. Five instructions upon the law of self-defense were given at the instance of plaintiff in error. An instruction should be considered with reference to other instructions, and a particular instruction need not contain all the law either of the case or upon a given subject. It is sufficient if the series of instructions, considered as a whole, fully and fairly announces the law applicable to the theories of the prosecution and of the defense. *Henry* v. *People,* 198 Ill. 162; *Quigg* v. *People,* 211 id. 17.

It is insisted that the evidence does not justify the verdict. Plaintiff in error admitted that he shot Olson and Flannery. He fled from the scene of the tragedy, departed in great haste from the hotel in which he lived, and arrived at the home of his brother-in-law at an early hour in the morning in great excitement and told him that he had taken six shots at some person. The statements he made to the police concerning the shooting differed materially. Olson drove the automobile and plaintiff in error and Flannery occupied the rear seat. Their respective positions in the car and the courses of the bullets through Olson's body scarcely lend credence to the claim of plaintiff in error that he shot in self-defense. The jury determined the questions of fact adversely to plaintiff in error, and this court will not disturb a verdict or reverse a judgment of conviction on the ground that the evidence is insufficient to convict, unless the verdict is palpably contrary to the weight of the evidence or the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. (*People* v. *Thompson,* 321 Ill. 594;

*People* v. *Jarecki,* 291 id. 80.)   Upon this record it cannot be said that the verdict is not supported by the evidence.

Finding no reversible error in the record the judgment of the criminal court must be affirmed.

*Judgment affirmed.*